IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Case No. 4:20-CR-355 Judge Mazzant |
| JAMES CLARK NIX | § | |

**THIRD SUPERSEDING INDICTMENT**



FEB 9 – 2022

Clerk, U.S. District Court
Texas Eastern

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this Indictment:

1. James Clark Nix ("**James Nix**") was an individual residing in Eagle, Idaho, Potomac, Maryland, and Katy, Texas.

2. **James Nix** and his son Bradley Nix owned, operated, and controlled two businesses, NECO International, Inc. ("NECO") and AMIG, LLC, ("AMIG"). Both NECO and AMIG conducted business in Lewisville, Texas, in the Eastern District of Texas.

3. In or around April 2014, **James Nix** and Bradley Nix opened bank accounts at Chase Bank, N.A., in the names of their businesses, AMIG ("AMIG account") and NECO ("NECO account").

4. Provident Trust Group, LLC ("PTG") was a self-directed retirement fund administrator used by individuals to direct and disburse investments and funds.

## COUNT 1

Violation: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

5. The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

6. From in or around 2001, and continuing through November 19, 2020, in the Eastern District of Texas and elsewhere, the defendant, **James Nix** and Bradley Nix, did conspire to commit wire fraud, a violation of Title 18 United States Code Section 1343, and knowingly and willfully joined in the agreement with the intent to further its unlawful purpose.

### Overview of the Conspiracy

7. **James Nix** and Bradley Nix worked as bookkeepers managing taxes for individuals and small businesses. James Nix and Bradley Nix relied on those personal and client relationships to secure investments in their businesses NECO and AMIG. The Nixes represented that the investments would: (1) be at little to no risk; (2) earn a significant rate of return of up to approximately ten percent per year; and (3) go towards corporate bonds, real property, or local businesses that needed an infusion of capital. In reality, the Nixes used the majority of investor funds for personal expenses, including luxury vehicles, residences, hotels, and to pay prior investors. All told, **James Nix** and Bradley Nix defrauded victim investors of more than $6,000,000.

## Purpose of the Conspiracy

8. It was the general purpose of the conspiracy for **James Nix** and **Bradley Nix** to unlawfully and unjustly enrich themselves by obtaining money from victims by means of materially false and fraudulent pretenses, representations, and promises.

## Manner and Means of the Conspiracy

9. The manner and means by which **James Nix** and **Bradley Nix** sought to accomplish the conspiracy included, among others, the following:

   a. **James Nix** and Bradley Nix used their businesses NECO and AMIG to market "investments" to their victims.

   b. **James Nix** and Bradley Nix solicited investments from, among other individuals, clients with whom they had long-standing personal and professional relationships.

   c. **James Nix** and Bradley Nix misrepresented that investments would be used for legitimate business purposes, such as corporate bonds, real property, or local businesses that needed capital infusion.

   d. **James Nix** and Bradley Nix frequently directed victims to send their money to a trust company or a self-directed retirement administrator, such as Provident Trust Group ("PTG"), Sterling Trust Group, or Equity Trust, so that the Nixes could access and supposedly "invest" the funds.

   e. **James Nix** and Bradley Nix provided promissory notes to the trust companies and self-directed retirement administrators in order to gain access to the victim funds. The notes would state, for example, that the Nixes' business AMIG was the borrower, that PTG was the lender, and that AMIG would repay the invested funds plus ten percent.

   f. **James Nix** and Bradley Nix used their NECO and AMIG bank accounts to receive and deposit investment funds from victims and to gain access to the funds for personal use.

   g. **James Nix** and Bradley Nix used the majority of investor funds on personal purchases and expenses, including vehicles, travel, and housing.

    h. **James Nix** and Bradley Nix provided false accounting statements to victim investors to assure them that their funds were secure.

    i. **James Nix** and Bradley Nix caused wire transmissions that affected interstate and foreign commerce.

### Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, the following acts, among others, were committed in the Eastern District of Texas and elsewhere.

***Victim Investor K.C.***

10.    An individual with initials K.C. hired **James Nix** and Bradley Nix to prepare his and his wife's taxes from approximately 1990 to 2001. Around 2014, **James Nix** discussed an investment opportunity with K.C. and his wife, representing to them that the investment would return approximately 10% annually and would be invested in drug stores, bars in Denton, Texas, a toy company, land with "federal subsidies," and oil wells in Washington state.

11.    Based on these representations, K.C. and his wife made multiple investments with AMIG. In one instance in or around May 2014, K.C. provided the Nixes a $100,000 check made out to AMIG, which K.C. and his wife secured from the sale of their home. On or about May 30, 2014, the Nixes deposited the $100,000 in the AMIG account.

12.    Over the next five years, **James Nix** did not invest K.C.'s funds as promised. **James Nix** and Bradley Nix transferred some of the funds to the NECO account, made payments on **James Nix's** personal credit cards, paid property taxes, and withdrew funds as

cash. Only a small portion of the funds went to the small business investments as **James Nix** had represented.

13.     In or around June 2019, K.C. advised the Nixes that he would be retiring soon and wanted to begin making monthly withdrawals on the investment within six months. Approximately six months later, prior to taking a cruise vacation, K.C. called **James Nix** regarding problems getting his monthly disbursement check. During the call, **James Nix** told K.C. that he (**James Nix**) did not have any money, that K.C. would not be getting any money, and that K.C. should just jump over the rail while on the cruise. **James Nix** never responded to K.C.'s subsequent efforts to reach him.

14.     Over the course of the scheme, K.C. and his wife made multiple investments with the Nixes and lost approximately $220,000.

***Victim Investor N.R.***

15.     In or around 2018, an individual with initials N.R. met with Bradley Nix at the AMIG office in Lewisville, Texas, in the Eastern District of Texas. Bradley Nix convinced N.R. to in invest in AMIG, representing, among other things, that AMIG would invest in smaller companies and would generate a guaranteed 10% return on investment.

16.     Based on these representations, N.R. made multiple investments with AMIG, including a $74,000 investment in March 2019. N.R. drew the funds for the investment from his individual retirement account. Bradley Nix directed N.R. to route the funds to AMIG through a self-directed retirement fund administrator, PTG.    Specifically, Bradley Nix

instructed N.R. to complete a "direction of investment" form, which allowed the Nixes to obtain the funds sent to and held by PTG.

17. **James Nix** provided and executed promissory notes to finalize the transfer of funds from PTG to his AMIG account. For example, shortly after N.R.'s $74,000 was deposited with PTG, **James Nix** provided a promissory note stating that AMIG would repay $74,000 *and* interest at the yearly rate of 10%. **James Nix** signed and provided the promissory note to PTG on or about March 11, 2019. The next day, on March 12, 2019, PTG initiated an interstate wire transfer of $74,000 of N.R.'s retirement funds to the Nix's AMIG account.

18. **James Nix** and Bradley Nix did not invest the funds as represented to N.R. Instead, the Nixes transferred N.R.'s investment to the NECO account, made payments to other investors, withdrew cash, and made payments on **James Nix's** personal credit cards. The Nixes never showed N.R. account statements, which small businesses received N.R.'s money, or how the money was "invested" or spent. In fact, less than 18 months after N.R.'s investment, the AMIG account that received N.R.'s retirement funds had a balance of less than $100. All told, N.R. lost a total of approximately $279,000.

*Scope of the Fraudulent Conduct*

19. **James Nix** and Bradley Nix solicited investments from other victim investors, many of whom invested tens of thousands of dollars of their retirement and personal savings. Each time, the Nixes used similar misrepresentations—that investments would go to corporate bonds, real property, and small business capital infusion. Contrary to those

representations, the Nixes used the funds for several non-business, non-investment purposes. For example, **James Nix** spent victim investor funds on: the purchase of Land Rover and Maserati automobiles; cash withdrawals; credit card payments; personal property taxes; payments to other investors; hotel stays; and housing expenses. In total, **James Nix** and Bradley Nix's defrauded their victims of at least $6,000,000.

All in violation of 18 U.S.C. § 1349.

## COUNT 2

Violation: 18 U.S.C. § 1343
(Wire Fraud)

20. Paragraphs 1 – 19 of this Indictment are realleged and incorporated by reference as though fully set forth herein, as constituting and describing **James Nix's** and Bradley Nix's knowing scheme to defraud victims and unlawfully obtain money by means of false and fraudulent pretenses, representations, and promises.

### Act in Execution of the Scheme

21. On or about the date set forth below, in the Eastern District of Texas and elsewhere, for the purpose of executing the above-described knowing scheme to defraud, **James Nix** and Bradley Nix, acting with the intent to defraud, knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce the following:

| DATE (ON OR ABOUT) | DESCRIPTION OF THE INTERSTATE WIRE TRANSMISSION |
|---|---|
| March 12, 2019 | Interstate wire transfer of approximately $74,000 consisting of N.R.'s investment funds from Provident Trust Group's Citizen's Business Bank account number XXXXXX2306, located in Ontario, California, to AMIG, LLC's Chase Bank, N.A account number XXXXXX6886, located in Texas |

All in violation of 18 U.S.C. § 1343.

## COUNTS 3 - 4

Violation: 18 U.S.C. §§ 1957 and 2
(Money Laundering and Aiding and Abetting)

22. Paragraphs 1 – 19 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

23. On or about the dates set forth below, in the Eastern District of Texas, and elsewhere, the defendant, **James Nix**, aided and abetted by others, both known and unknown to the Grand Jury, did knowingly engage and attempt to engage in the following monetary transactions, by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally-derived property of a value greater than $10,000.00, that is, the withdrawal, deposit, exchange, and transfer of funds, such property having been derived from a specified unlawful activity, that is wire fraud, a violation of 18 U.S.C. § 1343, as alleged in Count Two of the Indictment, and the monetary transaction took place within the United States:

| COUNT | DATE (ON OR ABOUT) | DESCRIPTION OF MONETARY TRANSACTION | AMOUNT OF TRANSACTION (APPROXIMATE) |
|---|---|---|---|
| 3 | December 22, 2016 | Remittance of cashier's check, the cashier's check being made payable to Land Rover Darien, drawn from AMIG, LLC, Chase Bank, N.A. XXXXXX6886 for the purchase of a 2016 Land Rover Discovery | $69,256.39 |

| COUNT | DATE (ON OR ABOUT) | DESCRIPTION OF MONETARY TRANSACTION | AMOUNT OF TRANSACTION (APPROXIMATE) |
|---|---|---|---|
| 4 | January 26, 2017 | Remittance of cashier's check, the cashier's check being made payable to Miller Motor Cars, drawn from AMIG, LLC, Chase Bank, N.A. XXXXXX6886 for the purchase of a 2017 Maserati Levante | $81,503.13 |

All in violation of 18 U.S.C. §§ 1957 and 2.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

### Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461

1. The allegations contained in Counts 1 through 4 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1343 or 18 U.S.C. § 1349, **James Nix**, shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The property which is subject to forfeiture, includes but is not limited to, the following:

    a. One (1) 2017 Maserati Levante bearing vehicle identification number (VIN) ZN661XUL8HX231458;

    b. One (1) 2016 Land Rover Discovery bearing VIN SALAK2V63GA837443;

    c. A money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendant is jointly and severally personally liable, including a money judgment.

3. Upon conviction of any violation of 18 U.S.C. § 1957, the defendant, **James Nix**, shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1), including a money judgment representing funds involved in the offense.

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant **James Nix**:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred, or sold to, or deposited with a third party;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of **James Nix** up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of **James Nix,** pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

5. By virtue of the commission of the offenses alleged in this Indictment, any and all interest that **James Nix** has in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

BRIT FEATHERSTON
UNITED STATES ATTORNEY

_____
ANAND VARADARAJAN
Assistant United States Attorney

Date: 2/19/22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Case No. 4:20-CR-355<br>Judge Mazzant |
| JAMES CLARK NIX | § | |

## **NOTICE OF PENALTY**

## **COUNTS 1-2**

Violation: 18 U.S.C. §§ 1349, 1343 (Wire Fraud and Conspiracy to Commit Wire Fraud)

Penalty: Imprisonment for a term not more than 20 years, a fine not to exceed $250,000.00, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than three years in addition to such term of imprisonment.

If the violation affected a financial institution, then:
Imprisonment for a term not more than 30 years, a fine not to exceed $1,000,000.00, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than five years in addition to such term of imprisonment.

Special
Assessment: $100.00 each count

## **COUNTS 3-4**

Violation: 18 U.S.C. §§ 1957 and 2 (Money Laundering and Aiding and Abetting)

Penalty: Imprisonment for a term not more than ten years, a fine not to exceed $250,000, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than three years in addition to such term of imprisonment.

Special Assessment: $100.00 each count