IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | Case No. 4:20-CR-355 |
| | § | Judge Mazzant |
| JAMES CLARK NIX | § | |

## UNITED STATES' SENTENCING MEMORANDUM AND REQUEST FOR UPWARD VARIANCE

The United States files this sentencing memorandum to respond to the defendant's objections to the Final Presentence Report (Dkt. No. 127) and to aid the Court in fashioning the appropriate sentence in this case. In summary, the defendant's objections should be overruled because they are not supported by the facts of James Nix's offense described in the PSR nor based on the evidence introduced at trial. And even if the objections were sustained, this Court should impose an upward variance, or stack the counts of conviction, to account for the egregious nature of the offense conduct.

I. **THE GUIDELINES ARE PROPERLY CALCULATED**

   a. **The PSR Correctly Applies the Sophisticated Means Offense Characteristic**

In properly applying the sophisticated means offense characteristic, the PSR states that "the defendant created an elaborate investment scheme that involved the creation of an investment firm, promissory notes, bank accounts, and presentations to entire victims to transfer their funds to the defendant's accounts." PSR ¶ 41. In this context, the definition of "sophisticated means" means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Commentary

Application Note 9.B., U.S.S.G. § 2B1.1. The defendant objects to the inclusion of this enhancement solely based on the assertion the defendant's conduct was simple and essentially involved a solicitation for funds, a deposit directly into the defendant's business bank account, and spending.  *See* Defendant's Objections to Presentence Report, pp. 1-2. Nix analogizes his conduct to that of the defendant in the *Valdez* case.  In that case, "the sole reason given [by the district court] for applying this enhancement is that Valdez took money directly deposited from Medicare into his operating account, which was in his name, and moved it into his investment accounts, which were also in his name." *United States v. Valdez*, 726 F.3d 684, 695 (5th Cir. 2013).  The Fifth Circuit found that it was wrong to apply the enhancement because "there is no indication that this open and transparent direct deposit and movement of funds involved sophisticated means or could have made it more difficult for his offense of health care fraud to be detected."  *Id*.  As the PSR offense conduct description and trial evidence shows, however, James Nix's conduct was not simply an "ask – deposit – spend" scheme but involved sophisticated means.

The PSR includes a discussion of the sophisticated means that James Nix and Bradley Nix employed to carry out their fraud scheme, including the use of two business bank accounts, using a self-directed retirement fund administrator (Provident Trust Group, or PTG), and directing the investors to open accounts with PTG in order to access investments that would earn an expected 10% rate of return.  PSR, pp. 5-6.  The Nixes would provide a promissory note to PTG indicating that AMIG (one of their business entities) was a borrower from the investor or from PTG for the benefit of the investor, and

in turn PTG would execute interstate wires of the investor funds to the AMIG Chase Bank account. PSR, p. 6. As it turns out, the promissory notes upon which PTG relied were illusory. Only after the funds were transferred from the investor to PTG, or deposited by the investor with PTG, then transferred from PTG to the defendant's AMIG corporate account, would the Nixes have access to the funds. To the investor and to PTG the transactions appeared legitimate because of the use of a third-party self-directed IRA trust company and the Nix's use of promissory notes. The PSR includes an illustration of this conduct related to investors R.K., N.R., and R.W. who each opened PTG accounts as directed by either James Nix or Bradley Nix (for N.R.) and each transferred hundreds of thousands of dollars into the PTG accounts in reliance on the defendant's representations. PSR, pp. 7-9. While on some occasions investors would transfer or write checks directly to one of the defendants' business entities, much of the defendant's profit from their scheme flowed through the PTG transit process described in the PSR and above.

Further, the trial evidence shows that James Nix employed sophisticated means in executing his fraud scheme. At trial the Court admitted exhibits showing: the AMIG account corporate entity set up by James Nix (Government's Trial Exhibit 11) ("GEX 11"); the AMIG bank account signature card (GEX 16A); an example of the PTG wire transfers of investor funds into the AMIG account (GEX 16F); and detailed Provident Trust Group records showing the account information, AMIG promissory notes, and transactions related to multiple victim-investors whose funds were transferred to AMIG (GEX 21). As an especially pernicious aspect of this scheme, PTG (unaware of James Nix's fraud scheme)

would send periodic statements to the various investors indicating that the sums that they had transferred to PTG, and directed to be transferred to the AMIG account, were still intact and had market value.  *E.g.*. GEX 21, p. 477-478, 737-738, 835-836.  In this way James Nix was effectively carrying out a "double-blind" fraud—a fraud against the investor who provided the funds and a fraud against PTG with his representations that AMIG would repay the funds that were transferred to it, and neither the investor nor PTG knew the reality of Nix's scheme.  This sophisticated smoke-screen allowed the Nixes to continue their scheme for nearly 20 years undetected.  Little did investors know that the Nixes were spending investors' funds almost as quickly as they came in.  The defendant's use of a third-party intermediary trust company, along with a corporate business bank account, false documentation, and the knowing direction to investors to set up accounts with PTG and send their money to PTG for later transmission to the AMIG account, all clearly demonstrates sophisticated means were employed in the offense conduct.

In light of the above, the PSR correctly includes a two-level sophisticated means increase in the offense level and the defendant's objection related to this issue should be overruled.

      **b. The PSR Correctly Applies the Abuse of a Position of Trust / Use of a Special Skill Enhancement**

The defendant has also objected to the application of an adjustment for James Nix's role in the offense based on U.S.S.G. § 3B1.3, abuse of a position of trust or use of a special skill.  Defendant's Objections to Presentence Report p. 2.  The PSR, however, correctly applied this enhancement, finding that "[t]he defendant was employed for many years as

an accountant and tax preparer, which provided him with specialized skills in the preparation and drafting of financial documents that a member of the general public would not have." PSR, ¶ 44. The defendant's objection is based on the fact that James Nix only had a bachelor's degree and that the report does not identify what documents were prepared by Nix that would have required special skills. Defendant's Objections, p. 2. Again, both information set out in the PSR and trial evidence show that this two-level adjustment was properly applied.

As the probation officer correctly assessed in his response to the defendant's objection, James Nix acted as a bookkeeper and accountant for clients for decades, preparing tax returns for individuals and businesses. *See* PSR, p. 22. Nix admitted as much during his interview with the probation officer. *See* PSR, ¶ 69. These are the types of skills, experience, and knowledge that a member of the public would not generally have attained. *Id*. Further, while to the Government's knowledge James Nix was not a *certified* public accountant, the defendant was able to use his existing client relationships—along with his insider knowledge of his client's assets gained from his preparation of their tax returns—to further his scheme. The offense conduct discussed within the PSR along with trial testimony shows that James Nix established a position of trust over years of working with several of his clients, then rolled out his pitch for investment, and even while stealing his client's money continued to portray to the victims that he was watching over their funds and had their best interests in mind.

The PSR notes the extent to which James Nix made use of his special skill as a

bookkeeper and (non-certified) accountant. *E.g.*, PSR ¶ 11 (both James and Bradley Nix managed taxes for clients); ¶¶ 15, 20, 27 (prepared taxes for victims of the fraud scheme for years prior to solicitation). In the context of this guideline provision, a formal graduate education or certification is not needed to find that the defendant had a "special skill" within the meaning of § 3B1.3. As the Tenth Circuit noted, "a defendant need not have completed formalized educational or licensing requirements in order to possess a special skill. Rather, a defendant's special skill can also be derived from experience or from self-teaching." *United States v. Gandy*, 36 F.3d 912, 914 (10th Cir. 1994) (citation omitted). It was this use of bookkeeping general accountancy-like skills and knowledge that enabled James Nix to springboard to a solicitation of funds from his clients. Further, as a bookkeeper James Nix would likely have understood the tax implications of moving a tax-deferred retirement fund from one account to another, thus making his suggestion of using PTG as a conduit for investing (and thus arguably preserving the tax-deferred nature of the funds) appear like a viable opportunity to his investor-victims. As to Nix's assertion in his objection that no documents were tied to his bookkeeping status, during the trial the Court admitted exhibits that appeared to be spreadsheets calculating the investment funds, including "interest" and "balance" that the investors had with AMIG. *See* GEX 80, 81, 82. Arguably Nix made use of his knowledge of spreadsheets and calculating "returns" in providing these documents as a part of the scheme (as they were fictitious). Additionally, while perhaps James Nix did not prepare specific tax-related documents in executing the self-directed IRA aspect of the scheme, his conduct is similar to that in *United States v.*

*Keiser*, in which the court noted that the defendant's skills and experience aided him in drawing in victims in the scheme:

> We emphasized that the district court found that the defendant's "extensive training and experience allowed him to draw victims into his fraud much more easily than someone without his skill" and that his "understanding of the intricacies of executing promissory notes and collateralizing them helped him establish a scheme that an otherwise unskilled person might have found more difficult to set up." . . .
>
> Likewise, in this case, it is irrelevant that Keiser did not specifically use his commodities broker's license to commit the offenses. Like the defendant in Bush, Keiser's "training and experience" and "understanding of the intricacies" involved in the scheme facilitated his solicitation of victims and commission of the fraud. . . *Indeed, some of the investors solicited by Keiser were familiar with Keiser as a result of his work as a commodities broker.* The district court did not clearly err in applying the § 3B1.3 enhancement.

*United States v. Keiser*, 578 F.3d 897, 906–07 (8th Cir. 2009) (emphasis added). In light of the above, the evidence supports the conclusion that James Nix had a special skill within the meaning of U.S.S.G. § 3B1.3 and made use of that skill in carrying out his fraud.

Further, the Court may properly conclude that James Nix also occupied a position of trust and abused that position in carrying out his fraud scheme. The PSR cites to U.S.S.G. § 3B1.3, which contains both the use of a special skill and the abuse of a position of trust as potential bases for increasing the offense level. *See* PSR ¶ 44. As noted above and in the PSR, as well as in testimony at trial from victims, James Nix had prepared taxes and kept the books for several of his victims, some for years, and this provided him a platform as a trusted individual (even a "friend") who had knowledge of financial affairs, taxes, and investments, and could provide security for the victims' funds. In this context the two-level increase in the offense level is available if the defend both possessed a

position of trust and used that position "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Positions of trust in general are shown by "professional or managerial discretion" and "minimal supervision." *United States v. Miller*, 906 F.3d 373, 377 (5th Cir. 2018) (citation omitted). In determining whether the defendant used the position to facilitate the offense, the Court may examine whether the position of trust provides an opportunity to defraud and significantly facilitates the offense, and whether the position put the defendant in a position superior to that of others to commit the offense. *Id*. at p. 378 (citations omitted). Here, James Nix no doubt occupied a position of trust relative to the victims of his fraud: he prepared taxes and kept books for several of them, had known them for years, held himself out as an accountant, and was trusted in light of these factors. His discretion with the investor funds was virtually unlimited and had no supervision from the investors. Further, Nix was in a superior position to others in his solicitation of investments—especially considering the funds were frequently the life savings and retirement funds of the individual investor victims, who surely would not have considered such a proposal from someone whom they did not know or have an established relationship with. It was this position that provided Nix an opportunity to commit the offense and facilitated the offense.

  In light of the above, the PSR was correct to include a two-level increase in the offense level based on James Nix's use of a special skill or alternatively an abuse of a position of trust, and the defendant's objection on this issue should be overruled.

## II. THE COURT SHOULD ISSUE A SENTENCE ABOVE THE CALCULATED GUIDELINE RANGE

Courts look to the factors under 18 U.S.C. § 3553(a) in fashioning an appropriate sentence. The Government submits that the first two factors under § 3553 justify an upward variance from the high end of the guideline range: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; and (2) "the need for the sentence imposed to reflect the seriousness of the offense, [] to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a). Specifically, when evaluating the propriety of a variance, these two factors highlight how this fraud case stands out from other fraud cases.

First, the scope of the fraud in this case is staggering. As indicated in the PSR and shown in trial, Nix's criminal scheme targeted at least 20 victims and caused at least $6.5 million in losses. It is important to note that these figures are conservative; they are estimates limited by the availability of financial records in this case, which only go back to 2012. However, testimony from the forensic accountant and victims at trial showed that the scheme and victim investments began several years prior to the financial records reviewed in this case, suggesting that the true losses are greater than what is captured in the PSR's offense conduct. Sheer victim and loss numbers aside, this Court should consider the near 20-year length of the criminal scheme. James Nix did not orchestrate a get-rich-quick scheme tricking strangers into sending him money. Instead, he engendered trust with clients over several years by performing legitimate bookkeeping services and building close-knit personal relationships. He then used that equity of trust, built up over

several years, to steal millions of dollars from them, perpetuate lies, and use it for his own personal gain.

Second, the type of victims and the nature of the losses in this case compel an above-guideline sentence. The victims here largely consisted of middle class, hardworking, self-made individuals trying to provide for their families. See Dkt. No. 114 (Victim Impact Statements Filed Under Seal). Accordingly, the money these victims entrusted with James Nix came from retirement and savings accounts. As the Court heard time and again during trial, those victims' funds were meant to pay for college tuition, make payments on homes, and provide financial security during retirement. Today, as shown in the victim impact statements, they are left without that financial security. Instead, the evidence showed how James Nix spent the vast majority of victim funds, sometimes within days of receipt, on luxury cars, luxury homes, and luxury hotel stays. The deliberate and reckless waste of millions of dollars in victim funds in itself justifies an upward variance.

Third, the defendant's behavior during the scheme, and even after, portray an individual who lacks contrition. For instance, at trial, one victim testified about a phone call with James Nix when she realized her $250,000 investment may be lost. Rather than offering comfort, promising to get the money back, or even apologizing, James Nix told the victim to "jump over the rail and end it all." PSR ¶ 17-18. James Nix's lack of remorse has even extended post-trial. Tellingly, during his interview with the probation officer, James Nix indicated that "he blames his son for their current legal circumstances." PSR ¶ 60. Such denial—after being presented with all the evidence, seeing victims cry

during trial, and watching a jury return a guilty verdict on all counts—is revealing of James Nix's true character.

As this Court has seen through the filings, the trial testimony, and Bradley Nix's sentencing hearing, this is a uniquely personal fraud case that has financially and emotionally devastated the victims in this case. The Government posits that the depth of the victim impact here is what sets this case apart from other fraud matters and drives the Government's request for an upward variance. In fact, if the Court finds that the statutory maximum of 20 years for the wire fraud and conspiracy count are not "adequate to achieve the total punishment," then the Court may run the sentences for the counts of conviction consecutively so as to produce an adequate sentence. U.S.S.G. § 5G1.2(c), (d); *see United States v. Rodriguez*, 41 F.4th 728, 731 (5th Cir. 2022) (upholding 300-month sentence in fraud case where counts of conviction run consecutively). For these reasons, the Government submits that the Court should grant an upward variance and impose a sentence above the high end of the guideline range.

Respectfully submitted,

BRIT FEATHERSTON
UNITED STATES ATTORNEY

*/s/ Anand Varadarajan*
ANAND VARADARAJAN
Assistant United States Attorney
Texas State Bar No. 24088576
Email:  anand.varadarajan@usdoj.gov

THOMAS E. GIBSON
Assistant United States Attorney
Texas State Bar No. 07875450
Email:  Tom.Gibson@usdoj.gov

G.R. JACKSON
Assistant United States Attorney
Texas State Bar No. 00784874
Email:  glenn.roque-jackson@usdoj.gov

BRENT L. ANDRUS
Assistant United States Attorney
New York State Bar No. 5143474
E-mail: brent.andrus@usdoj.gov

101 East Park Boulevard, Suite 500
Plano, Texas 75074
972-509-1201
Fax: 972-509-1209

## CERTIFICATE OF SERVICE

I certify a true and correct copy of this motion was served on defense counsel by electronic filing (CM/ECF) on this 15th day of September 2022.

*/s/ Anand Varadarajan*
Anand Varadarajan